## CITY OF DANBURY *v.* DANA INVESTMENT CORPORATION/LOT NUMBER GO8065 ET AL.
### (SC 15878)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

2

Argued April 21, 1998—officially released May 25, 1999

*Mark S. Baldwin,* for the appellant (defendant Philbury, Inc.).

*Thomas P. Malnati,* for the appellee (plaintiff).

*Opinion*

BORDEN, J. This is a joint appeal by the defendant Philbury, Inc. (Philbury),[1] from 111 separate judgments of strict foreclosure of municipal real estate tax liens rendered in favor of the plaintiff, the city of Danbury (city), after contested foreclosure actions tried to the court.[2] The issues involved are whether: (1) Philbury should have been permitted in these foreclosure proceedings to contest the assessments underlying the liens being foreclosed; and (2) the trial court properly awarded fees and costs in each of the 111 cases. We affirm the judgment in all respects except for the award of sheriff's fees, which we reverse and remand for a new hearing.

Certain facts and the procedural history are undisputed. The properties involved constitute 111 individual lots of an undeveloped, or paper, subdivision. Although it is not clear from the record precisely how many lots there are in the subdivision, it is undisputed that: the properties involved in these cases do not constitute all of the lots; the properties do not constitute all of the acreage in the subdivision; and the foreclosure of the liens does not cover all of the acreage in the subdivision.

---

[1] Philbury was the owner of the properties involved at the time of the judgment of foreclosure and the awarding of costs that are at issue in this appeal, and is the only appealing party. Other parties, including subordinate lienholders of various kinds, were named and served as defendants, but they are not involved in this appeal.

[2] Philbury appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

It further is undisputed that the properties are identified separately on the subdivision map, and have generated separate tax assessor's numbers, separate tax bills, and separate tax liens of varying amounts. It also is undisputed that: the subdivision originally was approved in 1974; despite the provisions of General Statutes § 8-26c,[3] its approval has been extended periodically over

[3] General Statutes § 8-26c provides: "Subdivision to be completed within five years of plan approval. Exception for approvals made on or before October 1, 1991. (a) Any person, firm or corporation making any subdivision of land, except as provided in section 8-26g, shall complete all work in connection with such subdivision within five years after the approval of the plan for such subdivision; the commission's endorsement of approval on the plan shall state the date on which such five-year period expires.

"(b) The subdivider or his successor in interest may apply for and the commission may grant one or more extensions of the time to complete all or part of the work in connection with such subdivision, provided the time for all extensions under this subsection shall not exceed ten years from the date the subdivision was approved. If the commission grants an extension of an approval, the commission may condition the approval on a determination of the adequacy of the amount of the bond or other surety furnished under section 8-25, securing to the municipality the actual completion of the work.

"(c) In the case of a subdivision plan approved on or after October 1, 1977, failure to complete all work within such five-year period or any extension thereof shall result in automatic expiration of the approval of such plan provided the commission shall file on the land records of the town in which such subdivision is located notice of such expiration and shall state such expiration on the subdivision plan on file in the office of the town clerk of such town, and no additional lots in the subdivision shall be conveyed by the subdivider or his successor in interest as such subdivider except with approval by the commission of a new application for subdivision of the subject land. If lots have been conveyed during such five-year period or any extension thereof, the municipality shall call the bond or other surety on said subdivision to the extent necessary to complete the bonded improvements and utilities required to serve those lots. 'Work' for purposes of this section means all physical improvements required by the approved plan, other than the staking out of lots, and includes but is not limited to the construction of roads, storm drainage facilities and water and sewer lines, the setting aside of open space and recreation areas, installation of telephone and electric services, planting of trees or other landscaping, and installation of retaining walls or other structures.

"(d) Notwithstanding the provisions of this section, any subdivision approval made under this section on or before October 1, 1991, shall expire not more than seven years from the date of such approval and the commis-

the past two decades; and the most recent extension, to August 31, 1998, was granted pursuant to a request by Philbury to the city's planning and zoning commission.[4]

By a writ returnable in May, 1994, the city brought these 111 separate actions to foreclose on the 111 separate tax liens that it duly had filed against the properties for unpaid real estate taxes for the tax years 1985 through 1991. Dana Investment Corporation (Dana), the owner of the properties at that time, was the named defendant, along with Philbury, which also was named as a defendant because it held a mortgage on the properties that was subordinate to the city's tax liens.[5] Because there were numerous lienholders against the properties, there were eighteen defendants named in the writ. Thereafter, Philbury foreclosed on the mortgage that it held and thereby acquired title to the properties. In June, 1995, the city withdrew the actions against Dana, and proceeded against Philbury as the owner of the properties. Thereafter, in July, 1996, the city amended the complaint to include foreclosure of tax liens for the tax years 1992 through 1994, so that the actions as

sion may grant one or more extensions of time to complete all or part of the work in connection with such subdivision, provided the time for all extensions under this subsection shall not exceed ten years from the date the subdivision was approved. If the subdivider or his successor in interest submits evidence to the commission that completion of the project was delayed because of a state or federal construction project, the approval shall expire not more than ten years from the date of such approval and the commission may grant one or more extensions of time to complete all or part of the work in connection with such subdivision, provided the time for all extensions shall not exceed fifteen years from the date the subdivision was approved. If the subdivider or his successor in interest prevails in an appeal of a decision of the commission on the subdivision under section 8-8, the time to complete the subdivision shall be tolled for the time of such appeal and until the commission implements the judicial decision."

[4] We express no opinion on the validity of the most recent, or any prior, extension of the subdivision.

[5] The mortgage originally had been conveyed in July, 1986, from Dana to Wedgestone Realty Investors Trust (Wedgestone), and ultimately was assigned by Wedgestone to Philbury in July, 1992.

ultimately tried were for foreclosure of tax liens representing unpaid taxes for the years 1985 through 1994. Philbury filed four special defenses.

In its first special defense, Philbury challenged the validity of the city's assessments of the properties "for the tax years in question" on the grounds that the assessments were "manifestly excessive, could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property," and that the city, therefore, "should be equitably estopped from collecting all such outstanding taxes." In its second special defense, Philbury alleged that, "by commencing 111 separate actions," the city had violated General Statutes § 52-248,[6] "and comes to this proceeding with unclean hands . . . thereby incurring unnecessary and duplicative costs and fees including . . . filing fees, title search fees, appraiser fees, sheriff fees, lis pendens fees, lien charges and attorneys' fees." Philbury also alleged that, pursuant to General Statutes § 52-257,[7] and Practice Book

[6] General Statutes § 52-248 provides: "Costs when there are more civil actions than necessary. When two or more civil actions are pending in the same court at the same time for the recovery of the same demand, or against two or more officers, upon receipts for executions arising from the same original judgment, the court shall not allow any costs in any such action, unless it is of the opinion that the commencement of all of the actions was necessary to secure the demand."

[7] General Statutes § 52-257 provides: "Fees of parties in civil actions. (a) The fees of parties in civil actions in which the matter in demand is not less than fifteen thousand dollars shall be: For each complaint, exclusive of signing and bond, five dollars for the first page and, for each succeeding page, two dollars; for each judgment file, two dollars for the first page and, for each additional page, one dollar and fifty cents. The prevailing party in any such civil action shall receive, by way of indemnity, the following sums: (1) For all proceedings before trial, fifty dollars; (2) for the trial of an issue of law or fact, seventy-five dollars, but if more than one issue of fact is tried at one time, only one trial fee shall be allowed; and (3) in difficult or extraordinary cases in the Superior Court, where a defense has been interposed, a further allowance, in the discretion of the court, not to exceed two hundred dollars.

"(b) Parties shall also receive: (1) For each witness attending court, his legal fee and mileage; (2) for each deposition taken out of the state, forty

§ 422, now § 18-15,[8] "all such duplicative and unnecessary costs and fees should be disallowed." Philbury further alleged that the city "could have, and should have, commenced a single action rather than 111 duplicative matters." In its third special defense, Philbury

dollars, and for each deposition within the state, thirty dollars; (3) on an application for the sale of property attached, the expenses incurred; (4) in any civil action affecting the title to real property situated in this state, or affecting any mortgage or lien thereon, the actual expense, not exceeding the sum of one hundred fifty dollars, of an examination of the land records concerning the title to the real property in question and such amount as the court or judge determines to be reasonable for the services of an expert on the value of the land when such value is in dispute; (5) for maps, plans, mechanical drawings and photographs, necessary or convenient in the trial of any action, a reasonable sum; (6) for copies of records used in evidence, bonds, recognizances and subpoenas, court and clerk's fees; (7) for the signing and service of process, the legal fees payable therefor, except that a fee shall not be allowed for the return of a subpoena to court; (8) the actual expense incurred in publishing orders of notice under direction of the court; (9) for each interpreter necessarily employed in the trial of any civil action, twenty dollars per diem; (10) for premiums upon all bonds or undertakings provided pursuant to statute, rule of court, order of court or stipulation of parties, including bonds in lieu of or in release or dissolution of attachment, the actual amount paid, not exceeding a reasonable amount; and (11) documented investigative costs and expenses, not exceeding the sum of two hundred dollars.

"(c) In all civil actions in which the matter in demand is less than fifteen thousand dollars, the prevailing party shall receive, by way of indemnity, the following sums: (1) For all proceedings before trial, ten dollars; and (2) for the trial of an issue of fact or law, fifteen dollars, but, if more than one issue of fact or law is tried at one time, only one trial fee shall be allowed.

"(d) The following sums may be allowed to the prevailing party in causes on appeal, in the discretion of the court: (1) For all proceedings, one hundred dollars; (2) for expenses actually incurred in printing or photoduplicating copies of briefs, a sum not exceeding two hundred dollars; and (3) to the plaintiff in error, plaintiff in a cause reserved, or appellant, as the case may be, the record fee, provided judgment shall be rendered in his favor. Such costs in the Superior Court in appealed causes and in the Supreme Court or Appellate Court shall be in the discretion of the court on reservation of a cause for advice, or when a new trial is granted.

"(e) The provisions of this section shall not interfere with the discretion of the court in taxing costs in actions in which equitable relief is demanded."

[8] Practice Book § 18-15 provides: "Costs where Both Legal and Equitable Issues

"Where legal and equitable matters or claims for relief arising out of the same transaction or transactions connected with the same subject of action

alleged that the city had unclean hands because it had caused the sheriff to serve process in violation of General Statutes (Rev. to 1993) § 52-261,[9] "and in such a

are joined in the same complaint, or where any pleading setting forth a matter which, before January 1, 1980, would have been cognizable only at law is met by setting up some equitable matter, either by itself or in connection with a legal defense, the costs upon the whole case shall be at the discretion of the judicial authority; but where legal and equitable causes of action which are wholly unconnected with each other are joined in the same complaint, the costs upon the judgment on the equitable causes of action only shall be discretionary."

[9] General Statutes (Rev. to 1993) § 52-261 provides: "Fees and expenses of sheriffs, deputy sheriffs and constables. Except as provided in section 52-261a, each officer or person who serves process, summons or attachments shall receive a fee of not more than twenty dollars for each process served and an additional fee of ten dollars for the second and each subsequent defendant upon whom the process is served. Each such officer or person shall also receive twenty-one cents for each mile of travel, to be computed from the place where he received the process to the place of service, and thence in the case of civil process to the place of return. If more than one process is served on one person at one time by any such officer or person, the total cost of travel for the service shall be the same as for the service of one process only. Each officer or person who serves process shall also receive the moneys actually paid for town clerk's fees on the service of process. Any officer or person required to summon jurors by personal service of a warrant to attend court shall receive for the first ten miles of travel while so engaged, such mileage to be computed from the place where he receives the process to the place of service, twenty-five cents for each mile, and for each additional mile, ten cents. For summoning any juror to attend court otherwise than by personal service of the warrant, such officer or person shall receive only the sum of fifty cents and actual disbursements necessarily expended by him in making service thereof as directed. Notwithstanding the provisions of this section, for summoning grand jurors, such officer or person shall receive only his actual expenses and such reasonable sum for services as are taxed by the court. The following fees shall be allowed and paid: (1) For taking bail or bail bond, one dollar; (2) for copies of writs and complaints, exclusive of endorsements, one dollar per page, not to exceed a total amount of nine hundred dollars in any particular matter; (3) for endorsements, forty cents per page or fraction thereof; (4) for service of a warrant for the seizure of intoxicating liquors, or for posting and leaving notices after the seizure, or for the destruction or delivery of any such liquors under order of court, twenty dollars; (5) for the removal and custody of such liquors so seized, reasonable expenses, and twenty dollars; (6) for levying an execution, when the money is actually collected and paid over, or the debt secured by the officer to the acceptance of the creditor, ten per cent on the amount of the execution, provided the minimum

manner so as to maximize the fees associated with commencing [the] proceedings, thereby incurring unnecessary and duplicative costs and fees." In its fourth special defense, Philbury incorporated the allegations of the first three defenses, and alleged further that the city's conduct was immoral, unfair and deceptive, constituting a violation of General Statutes § 42-110a et seq., the Connecticut Unfair Trade Practices Act (CUTPA).

The city moved to strike Philbury's special defenses, and the trial court granted the motion. Thereafter, in February, 1997, the cases were tried together as contested foreclosure cases. At the conclusion of the evidence on February 20, 1997, when Philbury sought to address the city's bill of costs, the court determined that the bill of costs would be passed on by the clerk as an initial matter, after which "there can be an appeal to the court." Philbury agreed to this procedure. Then, in each case, the court rendered a judgment of strict foreclosure, and awarded the city in each case: (1) an

fee for such execution shall be twenty dollars; (7) on the levy of an execution on real property and on application for sale of personal property attached, to each appraiser, for each half day of actual service, reasonable and customary expenses; (8) for causing an execution levied on real property to be recorded, fees for travel, twenty dollars and costs; (9) for services on an application for the sale of personal property attached, or in selling mortgaged property foreclosed under a decree of court, the same fees as for similar services on executions; (10) for committing any person to a community correctional center, in civil actions, twenty-one cents a mile for travel, from the place of the court to the community correctional center, in lieu of all other expenses; and (11) for summoning and attending a jury for reassessing damages or benefits on a highway, three dollars a day. The court shall tax as costs a reasonable amount for the care of property held by any officer under attachment or execution. The officer serving any attachment or execution may claim compensation for time and expenses of any person, in keeping, securing or removing property taken thereon, provided he shall make out a bill. The bill shall specify the labor done, and by whom, the time spent, the travel, the money paid, if any, and to whom and for what. The compensation for the services shall be reasonable and customary and the amount of expenses and shall be taxed by the court with the costs."

attorney's fee of $1600, for a total of $177,600; (2) a title search fee of $100, for a total of $11,100; and (3) an appraiser's fee of $110, which consisted of $100 for the appraisal and $10 for the appraiser's testimony in court,[10] for a total of $12,210. The court set a law day for Philbury of June 2, 1997, having taken into account Philbury's evidence that it had a potential buyer for 80 to 85 of the 111 lots for a total of approximately $1.3 million.

Thereafter, Philbury filed an objection to the city's bill of costs in each case and, pursuant to Practice Book § 412, now § 18-5 (a),[11] the parties appeared before the clerk for taxation of costs. The clerk taxed costs in each case based upon the city's bill of costs.[12] Philbury sought review by the trial court pursuant to Practice Book § 18-5 (b), and upon review, the court overruled Philbury's objections and entered the following orders awarding in each case: (1) an entry fee of $150, which already had been paid by the city, for a total of $16,650; and (2) sheriff's fees of approximately $1500, for a total of approximately $170,000.[13] The court purportedly calculated the sheriff's fees according to § 52-261; see footnote 9 of this opinion; as follows: "3505 miles traveled

[10] The city's appraiser was the only witness to testify as to the value of the properties, which he appraised at various amounts ranging from $3000 to $9500. Philbury did not offer any evidence of value.

[11] Practice Book § 18-5 provides: "Taxation of Costs; Appeal

"(a) Costs may be taxed by the clerk in civil cases fourteen days after the filing of a written bill of costs provided that no objection is filed. If a written objection is filed within the fourteen day period, notice shall be given by the clerk to all appearing parties of record of the date and time of the clerk's taxation. The parties may appear at such taxation and have the right to be heard by the clerk.

"(b) Either party may move the judicial authority for a review of the taxation by the clerk by filing a motion for review of taxation of costs within twenty days of the issuance of the notice of taxation by the clerk."

[12] The clerk did not tax a title search fee or an appraisal fee, however, because those costs had been awarded by the trial court at the time of the rendition of the judgment of strict foreclosure.

[13] It is difficult to discern from the record, and the parties have not specified, the precise amount of sheriff's fees in each case and the total amount

at .21 cents per mile, per writ and per lis pendens for a total of $1472.10 ($736.05 for all writs and $736.05 for all lis pendens)."[14]

This appeal followed. Additional facts will be set forth as they pertain to the various claims.

I

Philbury first claims that the trial court improperly struck its four special defenses. We disagree.

A

In its first special defense, Philbury alleged that the assessments on the properties for the tax years in question were manifestly excessive and could have been arrived at only by disregarding the statutes governing valuation of real property for tax purposes and, therefore, that the city should have been equitably estopped from collecting the taxes. Philbury claims that the trial court improperly struck this defense because "Philbury was wholly incapable of utilizing the statutory remedies" for challenging the assessments when they were made. Philbury argues that it was incapable of challenging the assessments earlier because: (1) it did not exist as a corporation during the relevant period;[15] and (2)

---

of sheriff's fees for the 111 cases. Philbury, however, asserts in its brief that the total amount of the fees exceeded $170,000, and the city does not contradict that approximate figure. We, therefore, have accepted the total figure of approximately $170,000, and have estimated the fee for individual lots at approximately $1500.

[14] It is not clear from the record, nor have the parties explained, precisely how this calculation was arrived at. The basis of it seems to be, however, the premises that: (1) in engaging in travel to serve the various defendants in each case, the sheriff was entitled to be paid as if he had made a separate trip for each defendant served; and (2) in recording the lis pendens he made a separate trip for each case.

[15] In support of this argument, Philbury asserts that it was created in 1992 as part of the bankruptcy reorganization plan of Wedgestone; see footnote 5 of this opinion; to hold assets for liquidation and distribution to creditors of Wedgestone's bankruptcy estate, and that Philbury did not acquire title to the properties until 1995.

even if the interests of Philbury's predecessor in interest, namely, Wedgestone, were imputed to Philbury, Wedgestone was merely a mortgagee on the properties and a mortgagee may not avail itself of the statutory procedures for appealing tax assessments. These arguments are without merit.

It is well settled that, if the owner of the properties at the times of the assessments in question had wanted to challenge the assessments, it would have been required to follow the appropriate statutory procedures, either by (1) timely appealing from the assessments to the city's board of assessment appeals pursuant to General Statutes §§ 12-111 and 12-112,[16] and from there

---

[16] General Statutes § 12-111 provides: "Appeals to board of assessment appeals. Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes and any person to whom title to such property has been transferred since the assessment date, claiming to be aggrieved by the doings of the assessors of such town may appeal therefrom to the board of assessment appeals. Such appeal shall be filed, in writing, on or before February twentieth. The written appeal shall include, but is not limited to, the property owner's name, name and position of the signer, description of the property which is the subject of the appeal, name and mailing address of the party to be sent all correspondence by the board of assessment appeals, reason for the appeal, appellant's estimate of value, signature of property owner, or duly authorized agent of the property owner, and date of signature. The board shall notify each aggrieved taxpayer who filed a written appeal in the proper form and in a timely manner, no later than March first immediately following the assessment date, of the date, time and place of the appeal hearing. Such notice shall be sent no later than seven calendar days preceding the hearing date except that the board may elect not to conduct an appeal hearing for any commercial, industrial, utility or apartment property with an assessed value greater than five hundred thousand dollars. The board shall, not later than March first, notify the appellant that the board has elected not to conduct an appeal hearing. The board shall determine all such appeals and send written notification of the final determination of such appeals to each such person within one week after such determination has been made. Such written notification shall include information describing the property owner's right to appeal the determination of such board. Such board may equalize and adjust the valuations and assessment lists of such town and may increase the items of taxable property in the list of any person, or the number, quantity or amount of any such item, or add to any such list any taxable property or interest

by timely appealing to the trial court pursuant to General Statutes § 12-117a,[17] or (2) timely bringing a direct

---

therein omitted by the assessors which should be added thereto; and may add to the assessment list the name of any person omitted by the assessors and owning taxable property in such town, and make a list for him, putting therein all property liable to taxation which it has reason to believe is owned by him, at the percentage of its actual valuation, as determined by the assessors in accordance with the provisions of sections 12-64 and 12-71, from the best information that it can obtain, and add thereto twenty-five per cent of such assessment; but, before proceeding to increase the list of any person or to add to the assessment list the name of any person so omitted, it shall mail to him, postage paid, at least one week before making such increase or addition, a written or printed notice addressed to him at the town in which he resides, to appear before such board and show cause why such increase or addition should not be made."

General Statutes § 12-112 provides: "Limit of time for appeals. No appeal from the doings of the assessors in any town shall be heard or entertained by the board of assessment appeals unless referred to it at one of its meetings during the month of September in the case of an appeal related to motor vehicle assessment or unless written appeal is made on or before February twentieth in accordance with the provisions of section 12-111."

[17] General Statutes § 12-117a provides: "Appeals from boards of tax review or boards of assessment appeals. Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed

action pursuant to General Statutes § 12-119.[18] "[A] tax-
payer who has failed to utilize the available statutory

or not more than ninety per cent of such tax with respect to any real property
for which the assessed value is five hundred thousand dollars or more, and
upon which such appeal is taken. If, during the pendency of such appeal,
a new assessment year begins, the applicant may amend his application as
to any matter therein, including an appeal for such new year, which is
affected by the inception of such new year and such applicant need not
appear before the board of tax review or board of assessment appeals, as
the case may be, to make such amendment effective. The court shall have
power to grant such relief as to justice and equity appertains, upon such
terms and in such manner and form as appear equitable, and, if the applica-
tion appears to have been made without probable cause, may tax double
or triple costs, as the case appears to demand; and, upon all such applica-
tions, costs may be taxed at the discretion of the court. If the assessment
made by the board of tax review or board of assessment appeals, as the
case may be, is reduced by said court, the applicant shall be reimbursed
by the town or city for any overpayment of taxes, together with interest
and any costs awarded by the court, or, at the applicant's option, shall be
granted a tax credit for such overpayment, interest and any costs awarded
by the court. Upon motion, said court shall, in event of such overpayment,
enter judgment in favor of such applicant and against such city or town for
the whole amount of such overpayment, together with interest and any costs
awarded by the court. The amount to which the assessment is so reduced
shall be the assessed value of such property on the grand lists for succeeding
years until the tax assessor finds that the value of the applicant's property
has increased or decreased."

[18] General Statutes § 12-119 provides: "Remedy when property wrongfully
assessed. When it is claimed that a tax has been laid on property not taxable
in the town or city in whose tax list such property was set, or that a tax
laid on property was computed on an assessment which, under all the
circumstances, was manifestly excessive and could not have been arrived
at except by disregarding the provisions of the statutes for determining the
valuation of such property, the owner thereof or any lessee thereof whose
lease has been recorded as provided in section 47-19 and who is bound
under the terms of his lease to pay real property taxes, prior to the payment
of such tax, may, in addition to the other remedies provided by law, make
application for relief to the superior court for the judicial district in which
such town or city is situated. Such application may be made within one
year from the date as of which the property was last evaluated for purposes
of taxation and shall be served and returned in the same manner as is
required in the case of a summons in a civil action, and the pendency of
such application shall not suspend action upon the tax against the applicant.
In all such actions, the Superior Court shall have power to grant such relief
upon such terms and in such manner and form as to justice and equity

remedies [may not] assert, in an action to collect a tax . . . that the tax has not been properly assessed." (Internal quotation marks omitted.) *Hartford* v. *Faith Center, Inc.*, 196 Conn. 487, 491, 493 A.2d 883 (1985); *Farmington* v. *Dowling*, 26 Conn. App. 545, 549–50, 602 A.2d 1047 (1992), appeal dismissed, 224 Conn. 592, 619 A.2d 852 (1993). The rationale for this rule is the need on the part of the government for fiscal certainty. A municipality, like any governmental entity, needs to know with reasonable certainty what its tax base is for each fiscal year, so that it responsibly can prepare a budget for that year. See *Norwich* v. *Lebanon*, 200 Conn. 697, 710, 513 A.2d 77 (1986) (both General Statutes [Rev. to 1985] §§ 12-118 and 12-119 "limit to a short period the time within which the property owner can seek relief under them, and the purpose of this is undoubtedly to prevent delays in the ultimate determination of the amounts a municipality can collect as taxes" [internal quotation marks omitted]); *Cohn* v. *Hartford*, 130 Conn. 699, 702, 37 A.2d 237 (1944) (same). Public policy requires, therefore, that taxes that have not been challenged timely cannot "be the subject of perpetual litigation, at any time, to suit the convenience of the taxpayer. . . . A taxpayer who has not sought redress in an appropriate manner is foreclosed from continuing litigation outside [those] statutes." (Internal quotation marks omitted.) *Owner-Operators Independent Drivers Assn. of America* v. *State*, 209 Conn. 679, 692, 553 A.2d 1104 (1989).[19]

---

appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

[19] This reasoning, moreover, is not inconsistent with our decision in *Jupiter Realty Co.* v. *Board of Tax Review*, 242 Conn. 363, 698 A.2d 312 (1997). In that case, we held that a taxpayer could mount a timely challenge to his 1992, 1993, 1994 and 1995 tax assessments by challenging the assessment determined for purposes of the 1991 decennial revaluation. Id., 374. Thus, in that case, the town was timely apprised of the challenges to its tax base for the fiscal years 1992–1996.

The same rule and the same policy apply to Philbury, regardless of whether it was in existence at the time of the assessments and irrespective of the legal status of its predecessor in interest as mortgagee, rather than owner. As a subsequent title holder, Philbury acquired no greater rights to challenge the prior assessments than was possessed by its immediate assignor or by any prior assignee from the owner of the properties at the time of the assessments. Philbury has presented no case, and we have found none, that permits a subsequent owner to raise an untimely challenge to an assessment simply because it was not in existence or did not have the legal standing to mount such a challenge at the time of the original assessment. Moreover, the policy underlying the rule applies with equal force to Philbury. To permit such an untimely challenge would wholly undermine the need for fiscal certainty upon which the rule is based.

## B

In its second and third special defenses, Philbury sought to challenge, on the basis of the unclean hands doctrine, what it claimed were unnecessarily duplicative filing fees, attorney's fees, title search fees, sheriff's fees and lis pendens fees. Philbury argues that the trial court improperly struck these defenses because, in an equitable proceeding, costs are discretionary and must be awarded as part of the judgment or not at all. This argument is equally without merit.

It is important to note the purely procedural nature of this question. The question is not whether Philbury was entitled to challenge the fees and costs involved by appropriate procedures and at appropriate times. The question is, rather, whether it was entitled to challenge the fees and costs by way of a special defense to the city's complaint for foreclosure of the liens. We conclude that it was not entitled to do so.

"The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action." *Grant* v. *Bassman*, 221 Conn. 465, 472–73, 604 A.2d 814 (1992); see also Practice Book § 10-50 ("[f]acts which are consistent with [the plaintiff's] statements [of fact] but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged"). The city's cause of action in each case was for foreclosure of its tax liens. Practice Book § 10-70[20] sets forth what a plaintiff needs to allege in order to foreclose a municipal tax or assessment lien. The fees and costs form no part of those necessary allegations. Moreover, Philbury, by its allegations, did not purport to claim that the city could not foreclose on its liens by virtue of the multiple fees and costs that Philbury challenged; it sought only to bar the awarding of those fees and costs incident to any such foreclosures. In short, the fees and costs had nothing to do with whether the city had a good cause of action for foreclosure of its liens.

---

[20] Practice Book § 10-70 provides: "—Foreclosure of Municipal Liens

"(a) In any action to foreclose a municipal tax or assessment lien the plaintiff need only allege and prove: (1) The ownership of the liened premises on the date when the same went into the tax list, or when said assessment was made; (2) that thereafter a tax in the amount specified in the list, or such assessment in the amount made, was duly and properly assessed upon the property and became due and payable; (3) (to be used only in cases where the lien has been continued by certificate) that thereafter a certificate of lien for the amount thereof was duly and properly filed and recorded in the land records of the said town on the date stated; (4) that no part of the same has been paid; and (5) other encumbrances as required by the preceding section.

"(b) When the lien has been continued by certificate, the production in court of the certificate of lien, or a certified copy thereof, shall be prima facie evidence that all requirements of law for the assessment and collection of the tax or assessment secured by it, and for the making and filing of the certificate, have been duly and properly complied with. Any claimed informality, irregularity or invalidity in the assessment or attempted collection of the tax, or in the lien filed, shall be matter of affirmative defense to be alleged and proved by the defendant."

We fail to see the relevance of Philbury's argument that costs in an equitable action are discretionary with the court. See Practice Book § 18-15 as set forth in footnote 8 of this opinion. It is elementary that, whether fees and costs are a matter of right or discretion, they ordinarily are awarded to the party that prevails in the case and, until there is a prevailing party, they do not arise. They play no role in determining whether a party has the right to prevail.

Philbury also relies on *Union Trust Co.* v. *Stamford Trust Co.*, 72 Conn. 86, 43 A. 555 (1899), for the proposition that " 'in equitable actions, costs are discretionary, *and if they are not awarded as part of the judgment, they are not taxable at all.*' " (Emphasis in original.) That case more properly is characterized as standing for the proposition that, in an equitable action, "[t]he omission to tax costs either for or against [a party] may fairly be regarded as equivalent to a decision that no such costs ought to be taxed . . . ." Id., 96. Thus, when the court in an equitable action ultimately taxes costs, they ought to be reflected in the judgment as finally constituted. That does not mean, however, that a challenge to such costs can constitute a special defense to the substantive equitable cause of action on which the plaintiff seeks to prevail.

C

In its fourth special defense, Philbury alleged that the city had violated CUTPA by overassessing the properties and by bringing 111 foreclosure actions, rather than just one action, thus engendering needless costs and fees. Philbury claims that the trial court improperly struck this defense because CUTPA is a legally cognizable defense to a foreclosure action, and because "the statutory exemption under CUTPA for public entities is wholly inapplicable." We disagree and conclude that the trial court properly struck this special defense.

First, this special defense merely incorporated the facts alleged in the first three special defenses. It did not allege any additional facts. As for the facts alleged in the first special defense, Philbury may not contest the underlying assessments in this case indirectly by way of a CUTPA special defense anymore than it could by attempting to do so directly, as it attempted to do in its unsuccessful first special defense. As for the facts alleged in the second and third special defenses, those facts concern only the costs and fees, and do not invalidate the city's underlying foreclosure causes of action. Those facts no more suffice to invalidate the city's foreclosure action on CUTPA grounds than they do on the grounds of unclean hands. Philbury gains nothing by attaching a CUTPA label to those facts.

Second, General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110a (4) defines " '[t]rade' and 'commerce' [as] the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Even if we were to assume that, in collecting real estate taxes owed to it, the city was engaged in "trade" or "commerce," we conclude that Philbury's special defense founders on General Statutes § 42-110c (a), which provides in relevant part: "Nothing in this chapter shall apply to: (1) Transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States . . . ."

In *Connelly* v. *Housing Authority*, 213 Conn. 354, 362, 567 A.2d 1212 (1990), we held that the actions of a municipal housing agency were exempt from CUTPA because the agency, a creature of statute, was acting

pursuant to and was regulated pervasively by statutes and regulations that "set forth in great detail the municipal landlord's responsibilities and provide[d] carefully balanced procedural and substantive remedies . . . ." In addition, using the history of the Federal Trade Commission Act as "the lodestar" for interpreting CUTPA, "we were unable to discover any instance in which that act ha[d] been applied to any act or practice of a local public agency . . . ." Id., 363–64. The same rationale applies to the city in the present case.

The process by which the city assesses real estate is authorized and regulated expressly by a pervasive statutory scheme. See General Statutes §§ 7-328, 12-40, 12-49, 12-52, 12-53, 12-53a, 12-55, 12-60, 12-62, 12-62h, 12-63b, 12-63c, 12-63d, 12-63e, 12-81, 12-81a, 12-81f, 12-89, 12-102, 12-107c, 12-107d, 12-107e, 12-109, 12-117, 12-120, 12-129n, 12-170, 12-170f, 12-170aa, 12-198, 12-199, 12-504b, 12-504f and 15-101bb. In addition, the procedures by which a taxpayer may challenge those assessments are set forth by a statutory scheme that carefully balances both the procedural and substantive remedies. See General Statutes §§ 12-53, 12-53a, 12-60, 12-63c, 12-89, 12-103, 12-107c, 12-107d, 12-107e, 12-107f, 12-111, 12-129d, 12-170 and 12-170cc. Furthermore, the processes by which the city may collect unpaid taxes are set forth explicitly by statute. See General Statutes §§ 12-135, 12-142, 12-145, 12-146, 12-146b, 12-155, 12-161 and 12-166. Finally, Philbury has presented no case, and we are aware of none, in which CUTPA has been applied to a municipality that is acting pursuant to statute in order to collect unpaid taxes by foreclosing on previously unchallenged tax liens.

## II

Philbury next claims that, irrespective of whether the fees and costs may be challenged by way of a special defense, it was improper for the trial court to award

multiple entry fees, attorney's fees, appraisal fees and sheriff's fees in these cases. Specifically, Philbury argues that: (1) with respect to the entry fees and the sheriff's fees, neither the clerk nor the trial court had the authority to order those fees because the court had not awarded them at the time of the rendition of the judgments of strict foreclosure; (2) the city was required by the terms of § 52-248; see footnote 6 of this opinion; and Practice Book § 133, now § 10-21,[21] to bring one foreclosure action, rather than 111 such actions, resulting in unnecessarily duplicative and excessive fees; (3) the sheriff's fees should have been disallowed as "patently outrageous"; and (4) the total of the costs and fees in these cases is so grossly excessive as to constitute an "unconstitutional taxing" of Philbury's property. Although we disagree with Philbury's first, second and fourth claims, we conclude that, with respect to the third claim, the trial court abused its

---

[21] Practice Book § 10-21 provides: "Joinder of Causes of Action

"In any civil action the plaintiff may include in the complaint both legal and equitable rights and causes of action, and demand both legal and equitable remedies; but, if several causes of action are united in the same complaint, they shall all be brought to recover, either (1) upon contract, express or implied, or (2) for injuries, with or without force, to person and property, or either, including a conversion of property to the defendant's use, or (3) for injuries to character, or (4) upon claims to recover real property, with or without damages for the withholding thereof, and the rents and profits of the same, or (5) upon claims to recover personal property specifically, with or without damages for the withholding thereof, or (6) claims arising by virtue of a contract or by operation of law in favor of or against a party in some representative or fiduciary capacity, or (7) upon claims, whether in contract or tort or both, arising out of the same transaction or transactions connected with the same subject of action. The several causes of action so united shall all belong to one of these classes, and, except in an action for the foreclosure of a mortgage or lien, shall affect all the parties to the action, and not require different places of trial, and shall be separately stated; and, in any case in which several causes of action are joined in the same complaint, or as matter of counterclaim or setoff in the answer, if it appears to the judicial authority that they cannot all be conveniently heard together, it may order a separate trial of any such cause of action or may direct that any one or more of them be deleted from the complaint or answer. (See General Statutes § 52-97 and annotations.)"

equitable discretion in awarding the amount of sheriff's fees that it did, and we remand the cases for a new hearing on these fees.

## A

We first consider Philbury's argument that the trial court and the clerk lacked authority to order the entry fees and the sheriff's fees because the court had not awarded them at the time of the rendition of the judgments of strict foreclosure. Philbury contends that, in an equitable action, costs are discretionary with the court "and *if they are not awarded as part of the judgment, they are not taxable at all.*" (Emphasis in original; internal quotation marks omitted.) Thus, under Philbury's view, when the court rendered its judgment of strict foreclosure and entered awards of attorney's and appraiser's fees, the court's failure also to award entry fees and sheriff's fees barred both the clerk and the court from thereafter doing so. We disagree.

First, Philbury agreed to leave the imposition of costs for entry fees and sheriff's fees to the clerk, subject to subsequent review by the trial court if necessary. Second, the procedure that occurred in the present case is precisely the procedure contemplated by Practice Book § 18-5; see footnote 11 of this opinion; which specifically provides for review by the court of the clerk's taxation of such costs, if timely requested. Indeed, that procedure makes eminent sense, and is undoubtedly the procedure followed by most if not all of our trial judges in foreclosure cases. Unlike entry fees and sheriff's fees, which in the ordinary case involve only ministerial calculations by the clerk of the court, the award of attorney's fees, title search fees and appraiser's fees involve the exercise of judicial discretion regarding professional services, some of which are rendered in the presence of the court and some of which are rendered outside of the presence of the court. Thus,

ordinarily the court will enter an order of attorney's fees, title search fees and appraiser's fees when it renders its judgment of foreclosure, leaving the matter of other costs to the procedures provided by the rules of practice. Under this sensible framework, the court has ample opportunities to consider any appeals to its equitable discretion regarding such fees and costs, either at the time it makes such awards or subsequently, upon review of the clerk's actions.[22]

## B

We next consider Philbury's argument that the city was required by § 52-248 and Practice Book § 10-21 to bring all of these cases in one action, which necessarily would have resulted in reduced fees. We agree with the city and the trial court that the city was not so required.

Section 52-248 provides in relevant part: "When two or more civil actions are pending in the same court at the same time for the recovery of the same demand . . . the court shall not allow any costs in any such action, unless it is of the opinion that the commencement of all of the actions was necessary to secure the demand." The trial court properly reasoned that these 111 cases were not "for the recovery of the same demand." As the trial court noted, each lot was a separate tax entity, with separate and varying tax bills and

---

[22] We reject Philbury's contention that "if the taxation of costs in a foreclosure action is left to the clerk of the court, the law days will likely run well before the costs are assessed . . . [see Practice Book § 18-5] . . . [because] in a typical foreclosure, where the first law day is set on the twenty-first day following judgment, it is virtually impossible for costs to be determined before the law days run . . . [and that, therefore], costs must be taxed *by the trial judge as part of the judgment or may not be taxed at all.*" (Emphasis in original.) First, it is hardly the "typical foreclosure" in which any law day is set as early as twenty-one days after the judgment. Indeed, the twenty day appeal period probably would preclude such a possibility. Second, even if that was to be the case, we are confident that our trial court judges would have the intellectual wherewithal to solve such a vexing conundrum.

liens thereon, and varying values. They were not all contiguous to each other, and did not constitute the entire acreage in the subdivision. Moreover, Philbury and its predecessors in interest successfully had kept them as part of an approved subdivision, which was to its obvious economic advantage, rather than to permit them to revert to raw acreage. Furthermore, Philbury had a potential buyer for only 80 to 85 of the 111 lots, indicating that it could not have regarded the properties as constituting one indivisible parcel.

In addition, General Statutes (Rev. to 1993) §§ 12-182 and 12-183[23] indicate that there are certain instances in

[23] General Statutes (Rev. to 1993) § 12-182 provides: "Summary foreclosure of tax liens. Whenever used in sections 12-182 to 12-194, inclusive, 'municipality' has the meaning given it in section 12-141 and 'tax' includes each property tax or assessment and each instalment and part thereof due a municipality, with any interest or other lawful charges incident thereto. In addition to other remedies provided by law, the tax collector of any municipality may bring in its name an action in the nature of an action in rem to foreclose a tax lien or liens on real estate the fair market value of which, in his judgment, is less than the total of the amounts due upon the tax liens and other encumbrances upon the property so liened and is not more than twenty thousand dollars with respect to any one parcel. No judgment shall be rendered in such proceeding for the recovery of a personal judgment against the owner of the property subject to such lien or liens or any person having an interest therein."

General Statutes (Rev. to 1993) § 12-183 provides: "Form of petition for summary foreclosure. The tax collector may, by his attorney, not more than once in each calendar year, file in the office of the clerk of the superior court for the judicial district in which the property is situated, a petition in the name of the municipality for the foreclosure of any tax lien or liens on the respective properties so liened, and may include in one petition any number of such properties, each of which shall be numbered serially. Such petition shall be addressed to the court, as above stated, and shall be substantially in the following form: 'The . . . . of . . . . , acting by its tax collector hereunto subscribing, herewith submits a list of properties located in the . . . . of . . . . upon which are liens for unpaid taxes and states that in his judgment the fair market value of each of such properties is not more than twenty thousand dollars and such value is less than the total amount due upon tax liens and other encumbrances thereon.' A list of the various parcels of property sought to be foreclosed shall follow, containing, as to each parcel, the following information: (a) A description sufficient to identify each parcel affected by any such tax lien. The latest description of such

which a municipality may combine multiple tax lien foreclosures in one civil action. Under those statutes, however, the tax collector must be of the opinion that the value of any of the separate properties does not exceed $20,000, and that its value is less than the total amount of the tax liens and other encumbrances thereon. As the city's counsel suggested at oral argument before this court, the city considered this option, but at the inception of the case could not in good faith certify to such values. In any event, Philbury has made no showing that these statutes were so clearly applicable such that it was somehow abusive for the city not to avail itself of them. Indeed, in view of Philbury's evidence that it had a potential purchaser for 80 to 85 of the lots for approximately $1.3 million, it is difficult to see how it could have argued that none of the lots exceeded $20,000 in value and that such value was less than the value of the tax lien thereon.

To the extent that Philbury's argument seeks to invoke the clean hands doctrine, the trial court was correct in declining to apply that doctrine so as to bar the city from collecting multiple fees and costs in the circumstances of this case. Philbury and its predecessors in interest had not made any tax payments on any

parcel as appears of record shall be considered a sufficient description and, in all cases in which such parcel can be further identified by a known street address, such address shall be included in the description; (b) the name, residence and, if known, the address of the owner or owners of such parcel as they appear on the most recent assessment list of the taxing district wherein such property is located; (c) the principal of such tax due thereon, the amount of which, with interest, if any, and the fees and other charges, is secured by such lien and the date or dates when the principal of such tax becomes due; (d) the name, residence and, if known, the address, of each present record holder of any interest in, or encumbrance on, such liened property and the nature and amount thereof, as disclosed by the land records; (e) the last day of the period during which such property may be redeemed, which shall be the last day of the fourth month after the month in which the list is filed in court. Such petition shall be verified by the oath of the tax collector that the information contained therein is true to the best of his knowledge and belief."

of the 111 lots for ten years. Indeed, Philbury character-
ized its failure to pay the taxes, after gaining title to
the properties in 1995, as a "prudent business decision."
As the trial court aptly noted, the clean hands doctrine
should not be employed at the behest of a party that
asserts it to avoid the consequences of its own wrongdo-
ing. *Cohen* v. *Cohen*, 182 Conn. 193, 204, 438 A.2d 55
(1980).

Philbury's reliance on Practice Book § 10-21; see foot-
note 21 of this opinion; requires little discussion. Put
most simply, that provision by its terms spells out when
certain separate causes of action may be joined in one
complaint. It does not purport to mandate when they
must be so joined.

We do not rule out the possibility that there may
be egregious cases of multiple tax lien foreclosures in
which, apart from the provisions of §§ 12-182 and 12-
183, the trial court could exercise its equitable discre-
tion to withhold certain fees and costs. As Philbury
points out, and the city agrees, it has long been our law
that "[c]osts in equitable actions are in the discretion
of the court . . . ." (Citations omitted.) *Markham* v.
*Smith*, 119 Conn. 355, 367, 176 A. 880 (1935); General
Statutes § 52-257 (e) ("[t]he provisions of this section
[governing costs in civil actions] shall not interfere with
the discretion of the court in taxing costs in actions in
which equitable relief is demanded"); Practice Book
§ 18-15 (costs in equitable causes of action "shall be
discretionary"). It is also our law, however, that "ordi-
narily [costs in equitable actions] are awarded upon the
same basis as in actions at law." *Markham* v. *Smith*,
supra, 367. The trial court in this case carefully consid-
ered the equities, and did not abuse its discretion in
determining that those equities did not require the city
to forego the ordinary costs because it brought these
multiple actions.

This analysis, then, brings us to General Statutes § 12-193,[24] which specifically covers "[c]ourt costs, reasonable appraiser's fees, and reasonable attorney's fees incurred by a municipality" in tax lien foreclosure cases. Despite the statute's use of the word "shall" in its first clause and "may" in its second clause, we conclude from its legislative history that it was intended to put municipalities on a par with private foreclosing parties regarding costs and fees, and therefore to incorporate into such cases the long-standing principle that costs and fees in equitable actions are discretionary with the court, but ordinarily are imposed as in actions at law.

Section 12-193 was enacted in two different parts, at two different times, and with two different purposes, both consistent with the general purpose to treat municipal tax lien cases like private foreclosure cases insofar as costs and fees are concerned. Prior to the 1975 amendment, General Statutes (Rev. to 1975) § 12-193 *prohibited* the taxation of costs and fees in municipal tax lien foreclosure cases.[25] In 1975, the legislature enacted No. 75-73 of the 1975 Public Acts, which amended General Statutes (Rev. to 1975) § 12-193. General Statutes (Rev. to 1977) § 12-193 provides: "Court costs, reasonable appraiser's fees, and reasonable attorney's fees incurred by a municipality as a result of any such foreclosure and directly related thereto shall be taxed in any such proceeding against any person or persons having title to any property so foreclosed." The

[24] General Statutes § 12-193 provides: "Costs and fees to be taxed. Court costs, reasonable appraiser's fees, and reasonable attorney's fees incurred by a municipality as a result of any foreclosure action brought pursuant to section 12-181 or 12-182 and directly related thereto shall be taxed in any such proceeding against any person or persons having title to any property so foreclosed and may be collected by the municipality once a foreclosure action has been brought pursuant to section 12-181 or 12-182."

[25] General Statutes (Rev. to 1975) § 12-193 provided: "No costs are to be taxed in any such proceeding [involving foreclosure of a municipal tax lien] against any person having title to or an interest in any properties listed in it."

purpose of Public Act 75-73 was to give municipalities the same rights to costs and fees as were afforded to private parties in foreclosure cases. See 18 H.R. Proc., Pt. 3, 1975 Sess., p. 1347, remarks of Representative Richard D. Tulisano.

In 1988, General Statutes (Rev. to 1987) § 12-193 was amended by adding the second clause, namely, "and may be collected by the municipality once a foreclosure action has been brought pursuant to section 12-181 or 12-182." Public Acts 1988, No. 88-153, § 1. The purpose of Public Act 88-153 also was to put municipalities on a par with private foreclosing parties, but in a different way. Prior to Public Act 88-153, it was not clear to municipalities whether, under the statute as amended by Public Act 75-73, a municipality could recover its costs and fees in a tax lien foreclosure case that did not proceed to final judgment. Thus, as often happened, if the delinquent taxpayer sought to pay his taxes in full after a tax lien foreclosure action had been commenced, the municipalities were not certain that they could require payment of the costs and fees as well, or whether in accepting the back taxes they were required to forego the expenses incurred in bringing the action. The purpose of Public Act 88-153 was to solve this problem for the municipalities, and to make clear that they could require the delinquent taxpayer to pay not only the back taxes, but the costs of the foreclosure action as well. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1988 Sess., pp. 1411–12, remarks of Susan Weisselberg, assistant corporation counsel for New Haven.

Applying the principle, therefore, as did the trial court, that costs and fees in these separately filed cases are discretionary with the court, we conclude that the trial court did not abuse its discretion in awarding the entry fees, attorney's fees, title search fees and appraiser's fees. The city was required to pay 111 entry fees for

justifiably bringing 111 separate actions. The attorney's fees were based on the time spent by the city's attorneys in preparing and litigating the 111 contested cases, were amply documented and, indeed, were *less than* the amount incurred by Philbury for the fees charged by its attorneys for litigating the same cases. Similarly, the city's attorneys were required to search 111 separate titles. The appraiser's fees were based on the separate appraisals of 111 separate parcels and the appraiser's testimony regarding each parcel, for which the court awarded the reasonable sum of $100 for the appraisal and $10 for the testimony. Thus, except for the entry fees, these fees were no different than had the city brought one action, rather than 111 separate actions.

C

We next consider the sheriff's fees in the total approximate amount of $170,000. See footnote 13 of this opinion. We conclude that the trial court abused its discretion in awarding this amount.

The following facts are undisputed.[26] The sheriff served process in all of the cases at the same time. He served fourteen of the original eighteen defendants by making a single trip from Danbury to Hartford, and stopping at two law firms and the office of the secretary of the state. Nonetheless, he calculated his charges as if he had made separate trips in unrelated matters. The sheriff charged $11,000 for travel fees in serving process, and in excess of $3600 for travel expenses associated with filing the 111 lis pendens on the land records in Danbury. His mileage charges were calculated as if he had traveled in excess of 51,000 miles.

In addition to § 12-193, which covers court costs in municipal tax lien foreclosure cases, sheriff's fees also

---

[26] These facts were established by way of the city's responses to Philbury's requests for admissions.

are governed by § 52-261. See footnote 9 of this opinion. Irrespective of what § 52-261 would justify in an ordinary case of multiple service of process by a sheriff, the facts of this case are extraordinary. As we have indicated, ultimately in awarding costs in an equitable proceeding, such as a foreclosure of lien, the court must exercise its discretion. It was an abuse of that discretion to award the sheriff's fees in these cases as if the sheriff had traveled approximately twice the earth's circumference in serving process, and had made 111 separate trips in filing the various lis pendens. The court should have exercised further oversight, and reduced the total sheriff's fees to a reasonable amount, taking into account the actual amount of travel engaged in and the services performed, with a reasonable premium added based on the fact that the sheriff was responsible for properly serving 111 writs, rather than just one writ, and filing 111 lis pendens, rather than just one lis pendens.

## D

Philbury's final claim, namely, that the total fees and costs[27] in these cases constitutes an unconstitutional taxing of Philbury's property, requires little discussion. Specifically, Philbury argues that the imposition of the total fees and costs in these cases "does not involve an exercise of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." (Internal quotation marks omitted.) *Windham First Taxing District* v. *Windham*, 208 Conn. 543,

---

[27] Although in the heading of this claim in its brief, Philbury refers only to the fees and costs, in the text of its argument Philbury also complains of the city's improper assessment of the lots at "several multiples of their actual fair market value . . . ." To the extent that this is an attempt to revive Philbury's ill conceived special defense to the foreclosure actions, it is equally ill conceived here. See part I of this opinion. Furthermore, as we have noted, Philbury offered no evidence of the value of the lots to contradict that of the city's appraiser.

557–58, 546 A.2d 226 (1988). We already have determined that the entry fees, the attorney's fees, the title search fees and the appraisal fees were properly calculated and awarded. We also have determined that the sheriff's fees must be reduced drastically and recalculated. There is no merit to Philbury's constitutional claim.

The judgment is reversed with respect to the award of sheriff's fees and the case is remanded to the trial court for a new hearing on the amount of those fees and for the imposition of new law days.

In this opinion CALLAHAN, C. J., and NORCOTT and KATZ, Js., concurred.

BERDON, J., dissenting. I am baffled by the majority's decision in this case. There is no plausible legal reason why the plaintiff, the city of Danbury, asserted more than 100 separate actions to foreclose tax liens on paper subdivisions of the same parcel of land. By doing so, the plaintiff incurred 111 sets of attorney's fees, 111 court entry fees, 111 sheriff's fees, 111 appraisal fees, and 111 title search fees.[1] As a result of these 111 foreclosure actions, the plaintiff incurred fees and costs in the amount of $388,000, all in an effort to collect taxes of less than $400,000 from a single entity. Significantly, the majority does not attempt to make the absurd argument that all of these actions were necessary. Instead, the majority claims that "these 111 cases were not 'for the recovery of the same demand.' " This is clearly false. Even if it were true, however, it would not somehow legitimize the plethora of separate actions. It is apparent that the plaintiff should have asserted only one foreclosure action, thereby incurring only one attorney's fee, one court entry fee, one sheriff's fee, one appraisal fee,

[1] The attorneys representing the plaintiff on appeal did not initiate these actions. Instead, present counsel did not file their appearance until after the plaintiff had sold and assigned all of its liens on the 111 lots.

and one title search fee. By condoning the plaintiff's tactic of extracting 111 separate fees and costs from what should have been a single foreclosure action, the majority of this court demeans the legal profession and undermines the credibility of the judiciary.

It is necessary to put these foreclosure actions in their proper perspective. "Foreclosure is peculiarly an equitable action, and the court may entertain such questions as are necessary to be determined in order that complete justice may be done." *Hartford Federal Savings & Loan Assn.* v. *Lenczyk*, 153 Conn. 457, 463, 217 A.2d 694 (1966). Accordingly, we must take as our lodestar the principle that, above all else, the fees and costs that we allow in the present case must be equitable.

I shall begin by briefly stating the material facts. The named defendant in this case, Dana Investment Corporation, owned the relevant property; the defendant Wedgestone Realty Investors Trust (Wedgestone) held a mortgage on that property. When Wedgestone went into bankruptcy, it assigned its mortgage to the defendant Philbury, Inc. (Philbury), a corporation created to hold and liquidate Wedgestone's assets for the benefit of its creditors. In sharp contrast to the plaintiff's 111 separate actions to foreclose tax liens, Philbury foreclosed the interests of eighteen lienholders in a single transaction—thereby incurring a single court entry fee, a single sheriff's fee, a single appraiser's fee, a single set of taxable court costs, and a single attorney's fee.

As a threshold matter, it has been well established for more than 200 years that the trial court—and not the clerk—must tax costs as part of an equitable judgment. See, e.g., *Union Trust Co.* v. *Stamford Trust Co.*, 72 Conn. 86, 96, 43 A. 555 (1899) ("[t]he omission to tax costs either for or against [a party] may fairly be regarded as equivalent to a decision that no such costs

ought to be taxed, and can support no exception in his favor"); *Bradley* v. *Hitchcock*, 1 Kirby (Conn.) 231 (1787) (execution ought not issue against mortgagor for costs on bill for foreclosure, but should be taxed by court); *Cassidy* v. *Waterbury*, 14 Conn. Sup. 39, 40 (1946) ("unless awarded as part of the judgment costs cannot be taxed"); W. Horton & K. Knox, 1A Connecticut Practice Series: Practice Book Annotated (4th Ed. 1998) § 18-5, comments, p. 81 ("if [costs in an equitable action] are not awarded as part of the judgment, they are not taxable at all"); 20 C.J.S. 121, Costs § 143 (1990) . ("[i]n respect of costs which require judicial investigation and determination, the court can order taxation only at a time at which final judgment is rendered"). Accordingly, the trial court incorrectly struck Philbury's second and third special defenses, which alleged that the costs associated with the assertion of 111 separate actions were inequitable and should not be permitted.

Turning to the merits of this case, the trial court abused its discretion by awarding fees and other costs of nearly $388,000 to collect taxes of less than $400,000 from a single entity. The lion's share of this staggering fee was incurred by instituting 111 separate actions when only one was necessary. The award is simply outrageous.

Even the majority concedes that the trial court "abused its equitable discretion in awarding the amount of sheriff's fees that it did . . . ." The sheriff charged in excess of $170,000 for—at best—three weeks of work.[2] This works out to something on the order of $8500 per day. I cannot imagine how anyone could possibly disagree with the majority's conclusion that the fees awarded to the sheriff must be reversed. Nevertheless,

---

[2] The writs, summonses and complaints in all of the 111 actions are dated April 15, 1994, and the sheriff completed service of process by May 5, 1994.

the majority leaves in place the 111 attorney's fees and other costs associated with the assertion of 111 separate foreclosure actions.

It is apparent to me that the logic by which the majority reverses the award of sheriff's fees applies with full force to the other costs that the plaintiff needlessly incurred. Aside from different docket numbers, the pleadings, motions, court appearances and briefs that the plaintiff used in every single one of the 111 actions were identical to one another.[3] Even the title of each case was identical. In essence, the only difference between the sheriff whose wrist the majority slaps and the attorney whom the majority slaps on the back is the fact that the latter was required to engage in xerography—that is, a secretary employed by the plaintiff's

---

[3] The plaintiff's bill of costs for each of its 111 actions provides as follows:

"[Docket number]                                  : SUPERIOR COURT
CITY OF DANBURY                           : J.D. OF DANBURY
            V.                                          : FEBRUARY 13, 1997
PHILBURY, INC.

AMENDED BILL OF COST

| | | |
|---|---|---|
| A. Court Entry Fee | | $ 150.00 |
| B. Sheriff Fees | | $ 1,547.00 |
| (1) Service of Process (Exhibit A) | $ 1,248.50* | |
| (2) Lis Pendens (Exhibit B) | $ 298.50* | |
| C. Title Search | | $ 157.04 |
| (1) Search Fee | $ 150.00 | |
| (2) Copy Charges ($781.00/111 lots) | $ 7.04 | |
| D. Appraisal Fee | | $ 100.00 |
| (1) Appraisal Report | $ 100.00 | |
| (2) Testimony** | $ 0.00 | |
| TOTAL | | $ 1,954.04 |

*The travel fee as represented in the bills produced by the Sheriff has been reduced to $6.88 per writ and $6.88 per Lis Pendens; calculated pursuant to [General Statutes] § 52-261—3505 miles traveled at 21 cents per mile, per writ and per Lis Pendens for a total of $1,472.10 ($736.05 for all writs and $736.05 for all Lis Pendens).

**[The] Plaintiff requests that the appraiser be paid his fee for testimony based upon the court's discretion and that [the] Plaintiff's Amended Bill of Cost be supplemented with said fee upon judgment."

attorney had to run off 111 copies of the same documents.[4]

The majority also condones the taxation of other duplicative costs in this case, thus ignoring the fact that what it characterizes as 111 "separate tax entit[ies]" were in fact nothing more than paper subdivisions of a single parcel of land. The majority struggles to leave the impression that 111 separate title searches and 111 separate appraisals consumed 111 times more energy than a single title search and appraisal would have required. The majority is simply incorrect.

The plaintiff probably could not have been prevented from instituting 111 separate foreclosure actions on paper subdivisions of the same parcel of land. This does not, however, mean that the trial court was required to multiply the costs associated with foreclosing a single parcel of property by a factor of 111. In an equitable action such as a foreclosure, costs are in the discretion of the trial court. See, e.g., *Markham* v. *Smith*, 119 Conn. 355, 367, 176 A. 880 (1935). "While it is normally true that this court will refrain from interfering with a trial court's exercise of discretion . . . this presupposes that the trial court did in fact exercise its discretion." (Internal quotation marks omitted.) *Higgins* v. *Karp*, 243 Conn. 495, 504, 706 A.2d 1 (1998); see *State*

---

[4] The majority claims that the award of attorney's fees was "justifiabl[e]" and, in fact, "less than the amount incurred by Philbury for the fees charged by its attorneys for litigating the same cases." Nothing in the record supports this claim. All the record contains is the following hypothetical question, which the trial court posed to the plaintiff's counsel: "Now if [the attorney] represented you exclusively on this matter for 720 hours, and he charged you $250 an hour, can we agree that that would be $180,000 in legal fees?" This hypothetical question cannot justify the titanic award of attorney's fees. The court asked the plaintiff's attorney to assume that 720 hours were necessary to prosecute a single foreclosure. This assumption is patently counterfactual: it is simply incomprehensible that an attorney could justify spending 720 hours prosecuting this foreclosure, even if it were broken up into 111 counts.

v. *Lee*, 229 Conn. 60, 73–74, 640 A.2d 553 (1994) ("[i]n the discretionary realm, it is improper for the trial court to fail to exercise its discretion"). "[D]iscretion imports something more than leeway in decision-making. . . . It means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *Higgins* v. *Karp*, supra, 504. It is apparent from the record in this case that the trial court failed to exercise its discretion in the interests of justice.[5]

In my view, decisions such as the one that the majority renders today further erode the public's confidence in the legal profession. The plaintiff's decision to bring 111 separate actions multiplied the proper cost of foreclosure by a factor of 111 and imposed a substantial and unnecessary burden on our courts—even though our dockets are already bursting at the seams—thus depriving other litigants of their right to speedy trials.

Accordingly, I dissent.

---

[5] This failure is evident from the trial court's own memorandum of decision on Philbury's motion for review of taxation and costs. The trial court apparently believed that it had no discretion to refrain from taxing Philbury for the costs associated with each of the 111 foreclosure actions, because each one was "separate and necessary . . . to secure the demand requested." For the reasons discussed previously, this belief was erroneous.